**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

PIVOT POINT COUNSELING, LLC, on behalf of itsself and all others similarly situated,

Plaintiff,

v.

CHANGE HEALTHCARE INC., UNITEDHEALTH GROUP INCORPORATED, UNITEDHEALTHCARE INC., and OPTUM, INC.,

Defendants.

**Case No: _____________**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**<u>INTRODUCTION AND SUMMARY OF ACTION</u>**

1. Plaintiff Pivot Point Counseling, LLC ("PPC"), on behalf of itself and all others similarly situated, alleges the following against Defendants UnitedHealth Group Incorporated, UnitedHealthcare, Inc., Optum, Inc., and Change Healthcare Inc. (collectively, "Defendants").

2. This class action is brought on behalf of businesses who have contracted with Change Healthcare Inc. for insurance processing and other services. These businesses have suffered tremendous disruptions to their core operations as a result of Defendants' network being offline. Defendants' insurance and payment processing network was taken offline in response to a major hacking attack by ALPHV/Blackcat on or around February 21, 2024 (the "Data Breach").

3. The Data Breach has affected countless millions of individuals across the country, and hundreds of thousands of businesses. At this time, it is unknown how many individuals' data has been compromised.[1] Issues related to the Data Breach are ongoing.

4. Plaintiff relies upon Defendants' processing network for core business functions. As a result of the outage, Plaintiff has been unable to receive insurance reimbursements, has suffered employee resignations, and has spent dozens of hours attempting to alleviate the situation.

5. Change Healthcare Inc. and associated entities, as medical industry experts, knew and should have known how to prevent a common cyberattack.

6. If Plaintiff knew Defendants' network was unreliable and open to cyberattacks, Plaintiff would have contracted with other companies for these services.

7. Accordingly, Plaintiff asserts claims for violations of negligence, negligent misrepresentation, breach of contract, breach of implied contract, and unjust enrichment/quasi-contract.

**PARTIES**

10. Plaintiff Pivot Point Counseling, LLC, is a counseling and mental health practice located at 4C North Avenue, Suite 423, Bel Air, Maryland, 21014. The members of Pivot Point Counseling, LLC, are citizens of Maryland. Plaintiff works with Change Healthcare's network for insurance reimbursements.

11. Defendant UnitedHealth Group Incorporated is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.

[1] Devna Bose, A large US health care tech company was hacked. It's leading to billing delays and security concerns (last accessed: March 1, 2024) https://apnews.com/article/change-cyberattack-hospitals-pharmacy-alphv-unitedhealthcare-521347eb9e8490dad695a7824ed11c414

12. Defendant UnitedHealthcare Inc. is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.

13. Defendant Change Healthcare Inc. provides revenue and payment management services for the healthcare industry. Change Healthcare Inc. is incorporated in Delaware with its principal place of business in Nashville, Tennessee. Change Healthcare is owned by Defendant UnitedHealth Group Incorporated.

14. Defendant Optum, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.

## JURISDICTION AND VENUE

15. The Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

16. This Court has specific jurisdiction over Defendants because Defendants have substantial business operations targeted towards and within this District, and Plaintiff's injury is directly related to Defendants' operation within this District.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims also occurred in this District.

## STATEMENT OF FACTS

18. Change Healthcare serves as an insurance clearinghouse for approximately half of all insurance claims filed in the United States. Change Healthcare also provides prescription processing services for insurers, providers, and patients and various other provider support services.

19. Optum Inc. is a provider of pharmacy management and medical administrative services to physicians, hospitals, government entities, health plans, and various related companies, reaching over 100 million consumers every year.[2]

20. October 2022 saw the acquisition of Change Healthcare by UnitedHealth Group. UnitedHealth Group undertook this acquisition in order to merge Optum Inc. with Change Healthcare. Optum's website states: "The combined businesses share a vision for achieving a simpler, more intelligent and adaptive health system for patients, payers and care providers. Optum is focused on connecting and simplifying the core clinical, administrative and payment processes health care providers and payers depend on to serve patients."[3]

21. The Data Breach occurred on or around February 21, 2024. Many of Change Healthcare's network services are still offline as of April 15, 2024.[4]

22. In February 2024, Change Healthcare confirmed that a cyberattack had compromised its systems. Change Healthcare moved to take its network down to prevent further access to patient PII and PHI by bad actors. Since this time, millions of payments and insurance reimbursements have been unable to be completed.

**Plaintiff's Experience**

23. Plaintiff is a mental health and counseling practice located in Maryland.

[2] *Optum: Technology and data-enabled care delivery*, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/people-and-businesses/businesses/optum.html (last visited Mar. 5, 2024).

[3] *Change Healthcare is now a part of Optum*, CHANGEHEALTHCARE, https://www.changehealthcare.com/optum (last visited March 5, 2024).

[4] *Information on the Change Healthcare Cyber Response*, UNITEDHEALTH GRUOP, https://www.unitedhealthgroup.com/ns/changehealthcare.html#:~:text=On%20March%2015%2C%20Change%20Healthcare's,is%20dependent%20on%20individual%20payers (last visited April 15, 2024).

24. Plaintiff uses TherapyNotes—a practice management software that allows Plaintiff to, among other things, record patient notes, maintain patient information, and keep track of patient therapy sessions for billing and insurance reimbursement purposes.

25. TherapyNotes integrates with Change Healthcare's network and, when functioning properly, provides Plaintiff and thousands of other healthcare providers with information relating to insurance coverage of claims.

26. Plaintiff received assurances that the network would be backed up and running in a relatively short period of time. This would have provided some inconvenience to Plaintiff's operations, but pales in comparison to what Plaintiff has experienced with the delays that have continued to occur.

27. An incident update from TherapyNotes dated March 5, 2024, lists out services that have been compromised. The list includes electronic claim submission, electronic remittance advice, and real-time eligibility checks.[5]

28. On March 7, 2024, TherapyNotes provided an update stating that Change Healthcare estimated the claims network would be back online by the week of March 18.[6]

29. On March 19, 2024, TherapyNotes provided another update stating that, due to delays, they are likely "a couple weeks away from being able to resume services, which of course is entirely unacceptable."[7]

30. Defendants have publicly stated that they are providing financial assistance to impacted providers. For Plaintiff, the total amount of assistance offered amounts to approximately

---

[5] *Change Healthcare Outage Update*, THERAPYNOTES, LLC, https://blog.therapynotes.com/change-healthcare-incident-update (last accessed April 2, 2024).
[6] *Id.*
[7] *Id.*

five percent (5%) of its weekly revenue stream, far below the level necessary to maintain normal operations without disruptions. Plaintiff initially accepted a portion of this money but then stopped upon realizing that this would create further issues in the future.

31. Because of Defendants' service outage, Plaintiff has not been able to file insurance claims through Defendants' service since February 26, 2024.

32. Plaintiff has sought alternative means of claims submission. This has led to many additional hours of employee time spent identifying these methods and learning how to use them. Plaintiff has additional hard costs of $1398.25 as a direct result of services filling the gap from what Defendants had been providing.

33. Plaintiff has attempted to accommodate this major loss in revenue as best it can. Plaintiff processed one pay period for employees using revenue from previously filed claims. Due to the outage, Plaintiff was not able to determine how much revenue each employee had brought in. Plaintiff instead had to change its employee compensation practice and average each of the last three paychecks that each employee had received to estimate the amount of compensation owed to each employee.[8]

34. The vast majority of Plaintiff's revenue stream has been cut off since Defendant's network was shut down in February. Because of this, Plaintiff has been unable to provide full compensation to employees after the pay period described above. Plaintiff compensated employees with a division of all revenue collected during the pay cycle, mostly from direct-pay income from clients. This was well below what employees were due for services rendered during the pay period.

---

[8] *Id.*

35. Change Healthcare continues to state that claims submissions are down as of April 15, 2024. Plaintiff has attempted as best it can to collect necessary information through other means, such as by contacting individual insurance companies. This requires major investment of time to train staff and perform this work. There is no workaround for this task, however.

36. Plaintiff has still not received information about remittances for payments submitted after February 21, 2024.[9]

37. As a result of this tremendous disruption, two employees have already resigned from Plaintiff's practice. One employee could not afford the gaps in payment and was forced to seek employment elsewhere. Another employee's transition from Plaintiff's practice was expedited due to the lack of payments. Both employees explicitly cited the disruptions in compensation as the cause of their resignation. This disruption has seriously impacted Plaintiff's retention and ability to be a competitive employment option for practitioners.

38. Plaintiff has attempted to provide for employees as best it can with these events. Plaintiff was forced to provide a loan in the amount of $4,300 to an employee on March 29, 2024.

39. Plaintiff lent an additional $2,486.46 to staff to help them fill the gaps in income, bringing the total lent to staff to $6,786.46.

40. In attempting to remedy and work around these issues, Plaintiff's staff have expended large amounts of time they would not have otherwise spent or would have spent on other business tasks. Plaintiff's professional staff have spent at least 139.5 hours attempting to redress these issues.

41. Change Healthcare has offered woefully insufficient supplementary funding to impacted providers. Plaintiff accepted this supplementary funding, though it is far from sufficient

---

[9] *Id.*

to fill the gap. Notably, this document contains a choice of law provision requiring those who accept to consent to jurisdiction and venue within the District of Minnesota. The document states that the laws of the state of Minnesota shall govern the agreement and any disputes arising under it.

42. Plaintiff anticipates spending significant amounts of time to address these issues going forward.

43. Despite holding itself out as holding expertise in healthcare IT, Change Healthcare did not take sufficient security measures to protect its network from cyber criminals.

44. Plaintiff continues to suffer significant harm to its business operations. Plaintiff cannot provide adequate compensation to employees and is not receiving revenue for services performed. With every day that goes by, more difficulties are created for Plaintiff, and more work will be needed to dig out of the backlog created by the Data Breach.

**The Healthcare Industry is the Top Target for Cyber Criminals, and Defendants Failed to Comply with Existing Industry Standards**

45. Ransomware attacks have been a well-known risk for healthcare providers for over a decade.

46. In 2020, the Ponemon Institute, one of the leading experts in cybersecurity research, released that the Healthcare industry was the most lucrative target for Data Breaches.[10]

47. The National Institute of Standards & Technology ("NIST") and HIPPA have both had their frameworks readily available, as advertised by the Department of Health and Human

[10] IBM, *How Much Would a Data Breach Cost Your Business?* https://www.ibm.com/security/data-breach

Services as a NIST-HIPPA crosswalk framework[11] since before 2016, to follow cybersecurity best practices for healthcare providers that included asset management, access control, and detection processes, as well as other steps that Defendants took after the data breach, rather than before.

## CLASS ACTION ALLEGATIONS

48. Plaintiff brings all counts, as set forth below, individually and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Nationwide Class defined as:

> All healthcare providers in the United States who have been unable to receive payment for insurance claims as a result of the February 2024 Data Breach (the "Nationwide Class").

49. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

50. *Numerosity*—Federal Rule of Civil Procedure 23(a)(1). The members of the Class are so numerous that joinder of all Class members would be impracticable. On information and belief, the Nationwide Class numbers in the hundreds of thousands.

51. *Commonality and Predominance*—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact exist as to all members of the Class and predominant over questions affecting only individual members of the Class. Such common questions of law or fact include, *inter alia*:

---

[11] HHS, *Addressing Gaps in Cybersecurity: OCR Releases Crosswalk Between HIPAA Security Rule and NIST Cybersecurity Framework* https://www.hhs.gov/guidance/document/addressing-gaps-cybersecurity-ocr-releases-crosswalk-between-hipaa-security-rule-and-nist#:~:text=In%20response%2C%20this%20crosswalk%20provides,a%20time%20of%20increasing%20risks (last accessed Feb. 23, 2016).

a. Whether Defendants owed a duty to maintain the functionality of data systems taken offline by the Data Breach;

b. Whether Defendants had a special duty to Plaintiff and Class Members;

c. Whether Defendants were negligent in failing to prevent the Data Breach;

d. Whether Defendants' conduct constitutes breach of an implied contract;

e. Whether Defendants willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff's and the Class's Private Information;

f. Whether Defendants were unjustly enriched by their actions; and

g. Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of itself and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

52. *Typicality*—Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claims are typical of the claims of the other members of the Class, because among other things, all Class members were similarly injured through Defendants' uniform misconduct described above and were thus all subject to the Data Breach and fallout alleged herein. Further, there are no defenses available to Defendants that are unique to Plaintiff.

53. *Adequacy of Representation*—Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the Nationwide Class because its interests do not conflict with the

interests of the Class it seeks to represent, it has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and its counsel.

54. *Injunctive Relief*—Federal Rule of Civil Procedure 23(b)(2). Defendants have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

55. *Superiority*—Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

56. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

57. Defendants owed numerous duties to Plaintiff and the Class, including the following:

a. to maintain functionality of the data systems relied upon by Plaintiff and Class Members in the operations of their businesses;

b. to protect PII using reasonable and adequate security procedures, systems, and resolutions that are compliant with industry-standard practices;

c. to design, maintain, and protect their computer systems against cyber-attacks;

d. to respond promptly to any outages and resume service as soon as possible;

e. to use reasonable security measures..

58. The duties Defendants owed to Plaintiff and the Class arose as a result of the special relationship that existed between Defendants and patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law.

59. It was reasonably foreseeable that Plaintiff and Class Members would suffer the harm that they have suffered and continue to suffer in the event of an outage of Defendants' systems.

60. Cyber-attacks upon Defendants' computer systems were reasonably foreseeable, especially given the volume of data stored by Defendants and the value of that data.

61. State statutes requiring reasonable data security measures, including but not limited to Minn. Stat. § 325E.61 require that "disclosure . . . be made in the most expedient time possible and without unreasonable delay" and require notifying all consumer reporting agencies when there is theft of private information.

62. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because cybersecurity and

healthcare industry standards bound Change Healthcare and other Defendants to protect confidential PII.

63. Change Healthcare's own conduct also created a foreseeable risk of harm to Plaintiffs and Class members and their PII. Change Healthcare's misconduct included failing to: (1) secure patients' PII and PHI; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; (4) respond to security alerts in a timely manner; and (5) implement the systems, policies, and procedures necessary to prevent this type of data breach. Defendants were in a special position, with Change Healthcare as an advertised cybersecurity expert, to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

64. Defendants breached their duties and thus were negligent. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard the functionality of Defendants' insurance clearinghouse system;

b. Failing to adequately monitor the security of Change Healthcare's networks and systems;

c. Allowing unauthorized access to patients' PII;

d. Failing to resolve in a timely manner that Class members' PII had been compromised; and

e. Failing to offer adequate protection to Class Members to mitigate the potential for damage to businesses as a result of their loss in claims-processing abilities.

But for Change Healthcare's breach of duties, Plaintiff and Class Members would still be able to process insurance renumerations.

65. Through Change Healthcare's acts and omissions described in this Complaint, including their failure to provide adequate security and their failure to protect critical data systems from being foreseeably captured, accessed, disseminated, stolen and misused, Change Healthcare unlawfully breached their duty to use reasonable care to adequately protect and secure Plaintiffs' and Class members' business interests.

66. Change Healthcare's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to, failing to adequately protect network systems.

67. Change Healthcare was in an exclusive position to protect against the harm suffered by Plaintiffs and Class members as a result of the Data Breach.

68. Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent disruptions to business functions as described in this Complaint.

69. There is a temporal and close causal connection between Change Healthcare's failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiffs and Class members.

70. Plaintiffs and Class members are also entitled to various other forms of relief requiring Defendants to, among other things, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide free credit monitoring and compensation for harm to all Class members.

**COUNT II**
**NEGLIGENT UNDERTAKING**

71. Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

72. Defendants undertook services that benefitted Plaintiff and Class Members, including serving as an insurance clearinghouse and payment processor.

73. In the course of this undertaking, Defendants knew or should have known of the need to properly secure all computer networks and IT infrastructure. Defendant knew or should have known to heed all reliable security warnings and to take appropriate actions to ensure the safety of all businesses processes.

74. Plaintiff and Class Members were not in a position to ensure that any of Defendants' security infrastructure was sufficient to prevent hacking and data breach incidents.

75. Defendants' breach of these duties placed Plaintiff and Class Members in a worse position than if they had not undertaken these duties. If Defendants had not done so, Plaintiff and Class Members, along with their practice management vendors, would have found a more reliable insurance clearinghouse to perform these services.

76. Defendants' failures and omissions were negligent given the known risks to the healthcare industry from cyber criminals.

77. Defendants knew or should have known that their failure to abide by their duties greatly increased the risk of harm to Plaintiff and Class Members beyond what that risk would have been without Defendants' undertaking.

78. Plaintiff and Class Members have suffered and continue to suffer injuries as a direct and proximate result of Defendants' negligent undertaking.

## COUNT III
## NEGLIGENT FAILURE TO WARN

79. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

80. Defendants knew or should have known for a significant time of the substantial risk that their computer networks faced from cyber-attacks.

81. Defendants knew or should have known of their failures and omissions to develop a sufficient cybersecurity infrastructure. These failures include but are not limited to; failing to implement adequate security protocols; failing to establish necessary procedures to ensure up to date security systems; failing to keep third party software up to date; failing to keep up to date about industry and expert advice around the most pressing threats; and failing to heed alerts about vulnerabilities to their cybersecurity systems.

82. Despite this, Defendants failed to provide notice to Plaintiff and Class Members of these security risks. Defendants further failed to warn Plaintiff and Class Members of the risks inherent in Defendants' failures and failed to give Plaintiff and Class Members prompt notice of the Data Breach.

83. Plaintiff and Class Members have suffered and continue to suffer injuries as a direct and proximate result of Defendants' negligent failure to warn.

## COUNT IV
## NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

84. Plaintiff re-alleges and incorporate by reference all preceding allegations as if fully set forth herein.

85. Plaintiff maintained an ongoing business relationship with TherapyNotes that would have continued to result in future economic benefits to Plaintiff.

86. Defendants knew or should have known of this relationship given the interaction and integration between Change Healthcare's network and services with TherapyNotes.

87. Defendants knew or should have known that Plaintiff's ongoing business operations and use of TherapyNotes would be disrupted in the event of Defendants' failure to exercise reasonable care to prevent a cyber-attack.

88. The disruption of this beneficial economic relationship has resulted in economic harm to Plaintiff.

89. Plaintiff and Class Members harm is directly related to Defendants' failures.

## COUNT V
## UNJUST ENRICHMENT / QUASI-CONTRACT

90. Plaintiff and Class members re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

91. Plaintiff and Class members conferred benefits upon Defendants by providing payment for clearing and processing insurance claims through practice management systems such as TherapyNotes.

92. Defendants were aware of these benefits.

93. Defendants should have invested some amount of this money into sufficient computer security systems and procedures.

94. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered the various types of damages alleged herein.

95. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, respectfully requests the following relief:

(a) An Order certifying this case as a class action;

(b) An Order appointing Plaintiff as class representative;

(c) An Order appointing the undersigned counsel as class counsel;

(d) An award of compensatory damages to Plaintiff, money for significant and reasonable time spent rectifying insurance processing issues, as well as statutory damages.

(e) Injunctive relief requiring Defendants to, *e.g.*: (i) strengthen and adequately fund their data security systems and monitoring procedures; (ii) submit to future independent annual audits of those systems and monitoring procedures; and (iv) implement encryption of sensitive PII in all databases for all clients;

(f) An Order for Defendants to pay equitable relief, in the form of disgorgement and restitution, and injunctive relief as may be appropriate;

(g) An Order for Defendants to pay both pre- and post-judgment interest on any amounts awarded;

(h) An award of Plaintiff's attorneys' fees and litigation costs; and

(i) Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

The Plaintiff and each Class hereby demand trial by a struck jury of all issues triable by right.

DATED: April 24, 2024

Respectfully submitted,

Nicholas A. Migliaccio
(Maryland Federal Bar No. 29077)
Jason S. Rathod
(Maryland Federal Bar No. 18424)
**MIGLIACCIO & RATHOD LLP**
412 H Street N.E., Ste. 302
Washington, DC 20002
Tel: (202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

Daniel E. Gustafson *
David A. Goodwin *
Joseph E. Nelson *
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
jnelson@gustafsongluek.com

* pro hac vice admission to be sought